Upon review of the competent evidence of record with respect to the errors assigned, and finding no good grounds to receive further evidence or rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An Employer-Employee relationship existed between plaintiff and defendant at all relevant times.
3. Defendant is self-insured and Crawford and Company is the servicing agent for plaintiff's claim.
4. On 16 August 1993, plaintiff suffered an admittedly compensable injury by accident arising out of and in the course of her employment with defendant.
5. Plaintiff's average weekly wage at the time of the compensable injury to her back was $258.00, yielding a compensation rate of $172.00.
6. At the hearing the parties agreed to stipulate into evidence, without further authentication or verification, a packet of records identified as Stipulated Exhibit 1 and consisting of 199 pages. This packet includes:
— Perdue Medical File;
— Triangle Spine Center records (Dr. Fulghum);
— Dr. Helen Harmon records (Quadrangle Medical);
— Roanoke-Chowan Hospital records;
— Dr. Melvin Clayton records;
— Dr. Meredith Anthony records;
— Dr. John Stanley records;
— Eastern Carolina Neurological records;
— Crawford Rehab letters;
— Employment File (selected documents);
— Rehability Center records;
— Southeastern Neurology records;
— Dr. Robert Kahn records;
— Dr. Bragg records (two sets); and,
 — Perdue Pay Sheet for 22 July 1996 through 8 November 1996.
 ***********
Based upon the competent evidence adduced at the hearing, the Full Commission adopts the findings of the Deputy Commissioner, with minor modifications, and makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a thirty-seven year old female who had not completed the eleventh grade. Plaintiff had worked for defendant since 1978. Before that time, she had only worked on a farm or baby-sitting.
2. On 16 August 1993, plaintiff worked at defendant's Lewiston facility as a wrapper machine operator packing livers and gizzards. On 16 August 1993, a forklift operator hit a table, which in turn hit plaintiff in the left side of her hip and back.
3. Plaintiff worked the balance of the day but woke up the following day in pain. Plaintiff presented to Letitia Bennett, the plant nurse, who referred her to an internist, Dr. Melvin Clayton. Defendant accepted compensability of the claim.
4. On 17 August 1993, Dr. Clayton examined plaintiff. He diagnosed a muscle strain and returned plaintiff to work with a restriction on lifting over 15 pounds. Dr. Clayton continued to treat plaintiff on a regular basis. In late September 1993, Dr. Clayton referred plaintiff to Dr. Helen Harmon, a rheumatologist, for evaluation due to plaintiff's continued complaints.
5. Plaintiff first saw Dr. Harmon complaining of low back pain and left knee pain. Dr. Harmon ordered a MRI of the low back and knee. The MRI of the knee was normal and the low back MRI showed two small disc bulges at L3-L4 and L4-L5. Dr. Harmon eventually referred plaintiff to a board-certified neurosurgeon, Dr. James Fulghum, for evaluation of her back problems. Defendant paid for all medical treatment by Dr. Harmon.
6. On 21 October 1993, plaintiff initially saw Dr. Timmons, a neurosurgeon in Greenville. Plaintiff made this appointment on her own, and was not referred to Dr. Timmons by defendant or by Dr. Harmon. Dr. Timmons reviewed the MRI and determined that the MRI was not diagnostic. Dr. Timmons found no motor deficit, normal reflexes, and inconsistent complaints, which could have indicated the existence of a radiculopathy. He requested more definitive tests, including a lumbar myelogram and post-myelogram CT. Plaintiff refused to undergo the recommended diagnostic tests. Defendant paid for this medical treatment.
7. Based on plaintiff's continued complaints and the referral by Dr. Harmon, defendant sent plaintiff to Dr. Fulghum. On 12 January 1994, Dr. Fulghum first saw plaintiff. Dr. Fulghum evaluated her prior MRI as showing no disc herniations but only disc bulges at L3-L4 and L4-L5. His physical examination showed normal motor examination, normal sensory examination, and normal reflexes. Dr. Fulghum found that there was no nerve involvement with plaintiff's back and determined that no surgical treatment was appropriate. Dr. Fulghum found plaintiff had reached maximum medical improvement (hereinafter "MMI") of her compensable injury, and assigned her a 5% permanent partial disability (hereinafter "PPD") rating to her back. He placed restrictions on lifting over 25 pounds and continuous sitting or standing for over one hour at a time.
8. On 20 January 1994, plaintiff returned to see Dr. Harmon. Dr. Harmon evaluated Dr. Fulghum's medical records and agreed that plaintiff had reached MMI of her compensable injury, and that Dr. Fulghum's restrictions and the PPD rating were appropriate.
9. Plaintiff returned to work at her regular job packing livers and gizzards because this job was within her medical restrictions. Plaintiff was provided a sit/stand, which allowed her to sit or stand as needed. Plaintiff was able to continue working in this fashion.
10. In February 1994, plaintiff returned to Dr. Fulghum. Dr. Fulghum requested a discogram based on plaintiff's continued complaints of pain. On 10 March 1994, the discogram was performed and found normal, with no evidence of focal herniation or nerve impingement. The disc bulges apparent on the previous MRI had resolved. Dr. Fulghum prescribed four to six weeks of physical therapy before a return to normal duties. On 6 April 1994, plaintiff returned to Dr. Fulghum complaining that she could not do the exercises prescribed for her. There were no new physical findings. Dr. Fulghum ordered a functional capacity evaluation (hereinafter "FCE") to determine plaintiff's work capacity.
11. In June 1994, an FCE was performed at Rehability. The FCE revealed that plaintiff displayed symptom magnification, poor effort in compliance, and positive Waddell's signs, which tend to indicate non-anatomic or exaggerated pain responses. On 6 June 1994, Dr. Fulghum reviewed these results and raised plaintiff's lifting limit to 35 pounds. He prescribed two weeks of work hardening before a return to work.
12. On 7 July 1994, plaintiff concluded the prescribed work hardening with Rehability. She was found to have the capacity for light to medium work. She was also determined to have poor attendance and poor motivation because she attended only five full and three half days of a nine full day course of treatment. The therapist recommended a full duty release to return to work.
13. On 21 July 1994, plaintiff returned to see Dr. Fulghum. Dr. Fulghum again released her to return to her prior job and found her to be at MMI. Dr. Fulghum also noted in his medical records that:
 I acknowledge the fact that this patient will continue to complain of rather diffuse pain. There is absolutely no organic basis upon which I can base a recommendation for other diagnostic studies or work-up. It is apparent that the patient's credibility is in question at this time.
14. On 11 October 1994, without referral or authorization, plaintiff returned to East Carolina Neurological, where Dr. Timmons practices, and was evaluated by Dr. J. Griffith Steel. Dr. Steel found normal motor examination and normal reflexes. He offered no other treatment recommendations for her back.
15. On 27 December 1994, plaintiff presented to Dr. Colin Jones at the Lewiston plant complaining of pain radiating down her leg. Dr. Jones referred her back to Dr. Fulghum, who again examined plaintiff on 11 January 1995. Dr. Fulghum's examination found normal motor strength, sensation, and reflexes. As a result of this examination, Dr. Fulghum opined that plaintiff:
 fulfills all of the criteria for functional overlay or malingering. I do not think that whatever is going on is in any way related to her back injury occurring 16 August 1993. As noted in the past, a discogram has been completely normal in regards to gross anatomy, but she has extremely discordant pain reproduction with all levels tested.
16. On 9 February 1995, plaintiff presented again to Dr. Steel with continued complaints of low back pain. Dr. Steel reviewed her examinations by Drs. Harmon and Fulghum. He concluded that he should not get involved in the case or perform any repeat studies. He offered no other medical treatment to plaintiff.
17. On 9 October 1995 and 23 October 1995, plaintiff was again re-evaluated by Dr. Fulghum. Dr. Fulghum found no abnormalities and offered only conservative treatment. On 11 January 1996, she returned to Dr. Fulghum with complaints of back and leg pain. Dr. Fulghum ordered EMG tests and a myelogram and post-myelogram CT, the tests previously refused by plaintiff. On 31 January 1996, the myelogram and post-myelogram CT were read by Dr. Fulghum and showed absolutely no abnormalities of the spine at any level, including L3-L4 and L4-L5, confirming the earlier discogram results. The EMG tests of Plaintiff's back and left leg were done on 14 February 1996 and read by Dr. Fulghum on 26 February 1996. These tests were also completely normal, with no sign of any neuropathy or radiculopathy. Dr. Fulghum reaffirmed his 11 January 1995 opinion that plaintiff's problems were not related to her compensable injury, and that plaintiff's existing restrictions and 5% PPD rating to her back were appropriate. Plaintiff has not seen Dr. Fulghum since that date. Defendant paid for all of Dr. Fulghum's medical treatment.
18. On 28 February 1996, plaintiff went out of work on a medical leave of absence due to prolonged pain in her foot. She signed a leave of absence form for a medical, not work-related, leave of absence. This leave of absence was authorized by Dr. Meredith Anthony, plaintiff's family doctor, who was not her authorized treating physician. She was out of work and received short-term disability benefits pursuant to an employer-sponsored, non-contributory disability plan from 28 February 1996 through 6 May 1996, when she returned to work. Plaintiff has not returned to Dr. Anthony since 29 April 1996, and she has not removed her from work after that date.
19. On 24 May 1996, plaintiff returned to her normal job packing livers and gizzards and continued to work in this job until July 1996, when she saw Anne Laskin, a physician's assistant at the Lewiston facility. Ms. Laskin took her out of work on 11 July 1996. Ms. Laskin's main concern was of plaintiff's liver problems based on a previous abnormal CT scan of plaintiff's abdomen. She removed plaintiff from work for evaluation of the liver problem. Because this was a non-work related problem, plaintiff again received short-term disability benefits pursuant to her employer-sponsored, non-contributory plan.
20. On 23 July 1996, Ms. Laskin re-evaluated plaintiff for complaints of vomiting, constipation, and epigastric discomfort. She again wanted to refer plaintiff to a gastroenterologist. At this time, she released plaintiff to return to modified duty. However, plaintiff did not return to work but remained out of work receiving short-term disability through the date of the hearing before the Deputy Commissioner.
21. On 1 August 1996, plaintiff was examined by Dr. William Doss, a neurologist, at defendant's facility. Plaintiff's complaints were of low back pain. Dr. Doss found essentially normal muscle strength and reflexes. He assessed a history of chronic low back pain with "possible functional overlay due to current problems." Dr. Doss suggested epidural blocks and referred plaintiff to Dr. Winifred Bragg, a physiatrist. Plaintiff saw Dr. Doss and Ms. Laskin on several more occasions in August 1996. Defendant paid for this medical treatment.
22. On 19 September 1996, plaintiff presented to Dr. Bragg, a physiatrist, a physician who specializes in physical medicine and rehabilitation. Upon her initial presentation, Dr. Bragg did not have any of the extensive medical records of Drs. Harmon, Fulghum, and Steel, or her FCE results. This examination showed no sign of back spasm, normal motor examination, and normal reflexes. Dr. Bragg ordered a MRI, and was unaware of plaintiff's previous MRI.
23. On 4 October 1996, Dr. Bragg again saw plaintiff. Plaintiff's physical examination remained the same and her straight leg raising was negative bilaterally. The second MRI showed no evidence of any stenosis or herniated disc at any level. The MRI showed only a degenerative disc at L4-L5.
24. Dr. Bragg erroneously notes at this visit that the EMG performed in February 1996 showed an acute radiculopathy into the leg. However, Dr. Bragg never saw the subject EMG report and relied on Dr. Doss' notes for the erroneous interpretation. When made aware of the normal EMG results, Dr. Bragg agreed that plaintiff is not suffering from any nerve involvement in her back and leg.
25. On 15 October 1996, Dr. Bragg performed a nerve block at the L4-L5 level. On 22 October 1996, plaintiff returned and stated that she did not obtain relief from the nerve block. Dr. Bragg felt that plaintiff's failure to obtain relief indicates that the nerves at the level of L4-L5 were not responsible for her complaints of pain, confirming the normal EMG results.
26. Dr. Bragg opined that since plaintiff's pain is not related to the nerves of the back, then it could be related to her degenerated disc. Dr. Bragg further testified that there are definitive tests to determine whether the disc is actually the pain generator and to validate her causation theory. Dr. Bragg named a discogram as the definitive such test. To her knowledge, no such test had been done.
27. However, Dr. Fulghum had performed a discogram on plaintiff in March 1994, the results of which were normal. With this information, Dr. Bragg testified that in her opinion it was clear that plaintiff's pain was not the result of any problems at the L4-L5 level or any degenerated disc. Dr. Bragg also testified that plaintiff's normal myelogram and post-myelogram CT would rule out any stenosis or nerve root impingement. Dr. Bragg cannot find any evidence of nerve involvement or nerve impingement with respect to plaintiff's back. Dr. Bragg has not removed plaintiff from work and is of the opinion that the wrapper machine operator job working with livers and gizzards is suitable for plaintiff.
28. Dr. Bragg deferred to Dr. Fulghum's opinion concerning plaintiff's condition prior to October 1996. She also testified that based on information which she reviewed at her deposition, but which had not previously been made available to her, she felt that Dr. Fulghum had taken all appropriate steps and she would have no reason to disagree with his opinions.
29. Plaintiff was out of work from 11 July 1996 through the hearing before the Deputy Commissioner. However, no physician removed plaintiff from work during this period due to her compensable injury. She has not sought employment during this period of time.
30. As a direct and proximate result of her 16 August 1993 compensable injury by accident, plaintiff retains a 5% permanent partial impairment of the spine.
31. Plaintiff's continued complaints of back and leg pain from 21 July 1994 until the present are not related to her 16 August 1993 injury by accident and are unrelated to her employment with defendant.
32. Plaintiff has failed to prove by the greater weight of the evidence that any continued disability after 21 July 1994 results from her 16 August 1993 injury.
 ***********
The foregoing stipulations and findings of fact engender the following additional:
 CONCLUSIONS OF LAW
1. Any disability plaintiff suffered after 21 July 1994 was not caused by her 16 August 1993 injury. Plaintiff's claim for additional compensation based on her inability to work after 21 July 1994 is not compensable under the provisions of the Act. N.C. Gen. Stat. §§ 97-2(6); 97-29; 97-30.
2. As a direct and proximate result of her compensable injury by accident, the plaintiff sustained a 5% permanent partial disability rating to the spine for which plaintiff is entitled to compensation at the rate of $172.00 per week for a period of 15 weeks. N.C. Gen. Stat. § 97-31(23).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 ORDER
1. Under the law, plaintiff's claim for additional compensation based on her inability to work after 21 July 1994 must be, and hereby is, DENIED.
2. For her 5% permanent partial disability of the spine, defendant shall pay permanent partial disability compensation to plaintiff at the rate of $172.00 per week for a period of 15 weeks. This amount shall be paid to plaintiff in a lump sum, subject to the attorney's fee approved in Paragraph 3.
3. A reasonable attorney's fee in the amount of 25% of the compensation due plaintiff under Paragraph 2 is approved for plaintiff's counsel and shall be paid by deducting from that sum and paying directly to plaintiff's counsel.
4. Defendant shall bear the costs. A fee of $155.00 is approved for Dr. Winifred Bragg for her 13 February 1997 deposition.
 S/ ________________________ RENÉE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/ ______________________ BERNADINE S. BALLANCE COMMISSIONER
S/ ______________________ LAURA K. MAVRETIC COMMISSIONER